313 Ga. 400
FINAL COPY

S21A1268.  DANIELS v. THE STATE.

BETHEL, Justice.

A Muscogee County jury found Kevonta Daniels guilty of felony murder in connection with the shooting death of Kenneth Moore; the aggravated assaults of Jai Williams, Jamal Williams, and James Williams; the theft of vehicles belonging to Jamal Williams, Marcus Jones, and Alvin Walker; and other offenses. Following the denial of his motion for new trial, Daniels argues on appeal that the trial court erred by admitting statements he made to the police into evidence at trial. Daniels, who was 14 years old at the time of the crimes and when he was interviewed by the police, specifically argues that the State failed to prove that he knowingly and voluntarily waived his constitutional rights before speaking with the police and that his statements should also have been excluded because the police failed to comply with provisions of the Juvenile

Code relating to custody of juvenile arrestees. We affirm.[1]

---

[1] The crimes occurred between December 17 and December 25, 2017. On July 10, 2018, a Muscogee County grand jury returned a 15-count indictment against Daniels, Marquez Clayton, Ladarius Render, and Devin Burden. The indictment charged Daniels, Clayton, and Render with the malice murder of Moore (Count 1); the felony murder of Moore (Count 2); burglary in the first degree of Moore's dwelling (Count 3); armed robbery of Moore (Count 4); the aggravated assaults of Moore, Jai Williams, Jamal Williams, and James Williams (Counts 5, 8, 9, and 10); and theft by taking a vehicle belonging to Jamal Williams (Count 12). Daniels and Render were charged jointly with theft by taking a vehicle belonging to Marcus Jones (Count 6). Daniels was charged individually with possession of a firearm during the commission of a felony (Count 13) and theft by taking a vehicle belonging to Alvin Walker (Count 14). Burden was charged individually with theft by receiving Jones's stolen vehicle (Count 7) and possession of a firearm during the commission of a felony (Count 11). Render was charged individually with theft by receiving Walker's stolen vehicle (Count 15).

Burden's case was severed from those of the other co-defendants, and he testified as a witness for the State. It appears that he later entered guilty pleas as to Counts 7 through 12. His case is not part of this appeal.

Daniels, Clayton, and Render were tried before a jury from June 17 to June 27, 2019. As to Daniels, Clayton, and Render, the trial court entered a directed verdict of not guilty as to Count 4. The jury found Daniels not guilty of Count 1 and guilty of Counts 2, 3, 5, 6, 8, 9, 10, 12, 13, and 14. Clayton was tried only as to Counts 1, 2, 3, and 5 and found not guilty of each count. The jury found Render not guilty of Counts 1 and 6 but guilty of Counts 2, 3, 5, 8, 9, 10, 12, and 15. Clayton and Render's cases are not part of this appeal.

On August 26, 2019, the trial court sentenced Daniels to life in prison on Count 2; 20 years in prison on Count 8, to be served consecutively to Count 2; ten years in prison on Count 6, to be served concurrently with Count 8; 20 years in prison on Count 9, to be served concurrently with Count 8; 20 years in prison on Count 10, to be served concurrently with Count 9; ten years in prison on Count 12, to be served concurrently with Count 8; five years in prison on Count 13, to be served consecutively to Count 2; and ten years in prison on Count 14, to be served concurrently with Count 10. The trial court merged Counts 3 and 5 into Count 2 for sentencing. The State has not challenged this purported merger, and we decline to address it sua sponte. See *Dixon v. State*, 302 Ga.

1. The evidence presented at trial showed the following. During the early morning of December 17, 2017, Daniels stole a red Toyota Tacoma truck from Marcus Jones's residence in Columbus. The next day, Daniels and Ladarius Render drove the truck to Kenneth Moore's home on Curry Street. Daniels then kicked in the back door of Moore's house, and Daniels and Render went inside. They took Christmas presents, Moore's cell phone, and a key ring with spare keys to three cars owned by the Moore family.

Moore returned home while Daniels and Render were still inside, and he was shot twice, once in the abdomen and once in the shoulder. Daniels later told Devin Burden that both he and Render fired shots at Moore. Around 10:30 a.m., police officers responded to a 911 call. They found Moore inside his house injured from gunshot wounds, but conscious. Moore was taken to the hospital.

691, 696-698 (4) (808 SE2d 696) (2017).
    Daniels filed a motion for new trial on June 29, 2019, which he amended through new counsel on November 12, 2020. Following a hearing on December 16, 2020, the trial court denied Daniels's motion for new trial, as amended, on February 19, 2021. Daniels filed a notice of appeal on March 3, 2021. His case was docketed to this Court's August 2021 term and submitted for a decision on the briefs.

Moore spent 13 days in the hospital, underwent two surgeries, and eventually died on January 1, 2018. The medical examiner determined that Moore's death was caused by a series of blood clots in his lower extremities resulting from his two gunshot wounds and that the manner of death was homicide.

At some point, Daniels gave Jones's truck to Burden, who knew that it had been stolen. On December 21, 2017, the truck was found by the police.

On December 24, Alvin Walker went outside to start his 2004 Acura MDX at his home on Muriel Street. After starting the car, Walker went inside for about three minutes, leaving his car unlocked and unattended. While Walker was inside, Daniels got into the running Acura and drove it away. When Walker came back outside, the Acura was gone. Later that night, Walker saw someone drive the Acura by his house.

The next day, December 25, Jamal Williams drove to his parents' house on Dirk Way. After he arrived, Jamal left his Buick Lucerne running while he went inside the house. Daniels, Render,

and Burden drove by in the stolen Acura and noticed the unaccompanied Buick running in the driveway. Daniels got out of the Acura and into the running Buick and drove away. Still in the Acura, Render and Burden followed Daniels in the Buick.

Inside the house, Jamal's father, James Williams, grabbed his gun and James, Jamal, and Jamal's brother, Jai Williams, went after the Buick in James's car. They followed the Buick to Belvedere Park.

When they saw the Williamses approaching, Render and Burden drove away in the stolen Acura to retrieve weapons. Daniels fired a shot which shattered the glass of James's car and hit Jamal. James and Jai fired multiple shots back at Daniels. Jai recovered the Buick after the shootout and drove it back to James's house.

The Columbus police recovered Walker's Acura a few days later. Inside the Acura, officers recovered a Charter Arms .38-caliber revolver. There was also a shell casing on the floorboard. Although the Williamses stated that no shots had been fired at them from the Acura, Burden later told the police that the revolver had been used

in the shooting at Belvedere Park.

Daniels was arrested at his home around 9:45 a.m. on January 11, 2018, and was taken to a Columbus police station. Through the use of an advice-of-rights form designed specifically for juveniles, Daniels was given *Miranda* warnings[2] by Detective Jason Carden at 11:40 a.m.[3] Detective Carden then interviewed Daniels regarding some vehicle break-ins unrelated to this case.[4] When Detective Carden concluded his questioning, Investigator Ray Harralson asked Daniels about the thefts of a Toyota Tacoma and an Acura and some other thefts unrelated to this case. Investigator Harralson testified at trial that Daniels confessed to being involved in the thefts of the Tacoma and Acura. Investigator Joseph Austin entered

---

[2] See *Miranda v. Arizona*, 384 U.S. 436 (86 SCt 1602, 16 LE2d 694) (1966).

[3] Detective Carden testified that the form he read to Daniels included "layman's terms for a juvenile" further explaining each of the *Miranda* warnings. As he was talking through the form with Daniels, Detective Carden referred to the reading of the rights form as a "formality" that they needed to complete before Daniels could talk to the officers.

[4] It appears that Daniels did not challenge the admission of testimony regarding unrelated crimes by witnesses for the State under OCGA § 24-4-404 (b), and he has not challenged any evidence presented at trial on that basis in this appeal.

the room and assisted Investigator Harralson with his questioning for about 15 minutes. Investigator Austin then began questioning Daniels about a different set of vehicle thefts after Investigator Harralson concluded his questions. Investigator Austin testified that during their discussion Daniels admitted that he stole a Buick and that he had been a part of the shooting at Belvedere Park.[5] Investigator Austin testified that he did not provide Daniels with food but was told Daniels was given two slices of pizza and something to drink at the police station.

At some point that afternoon, Daniels was moved to a different interview room.[6] At 3:25 p.m., Daniels again received *Miranda*

---

[5] Daniels's interviews with Detective Carden and Investigators Harralson and Austin were audio- and video-recorded on a single recording, which was admitted as State's Exhibit 20 in conjunction with Detective Carden's testimony. It appears from the record that only the portion of the recording showing Detective Carden advising Daniels of his rights was played for the jury. During the portion of that interview where Investigators Harralson and Austin questioned Daniels, the audio was garbled and largely unintelligible. The video shows both officers in the room speaking with Daniels, and the date and time are displayed on the video. Both Investigators Harralson and Austin testified at trial regarding their interviews of Daniels, but the portion of the recording of their discussions with him was not played for the jury.

[6] The recording shows that Investigators Harralson and Austin

warnings through the use of a juvenile advice-of-rights form from Detective Delante Odom. Detective Odom then told Daniels that he wanted to talk to him about the Curry Street burglary. Around 3:35 p.m., Daniels told Detective Odom that he kicked in the door to Moore's house, searched for money and jewelry, and then ran out of the house after hearing a gunshot. Detective Odom's interview with Daniels concluded just after 4:00 p.m.[7]

continued questioning Daniels until around 1:20 p.m. and then left Daniels alone in the interview room. The recording continued running until 1:41 p.m., at which time Daniels could still be seen sitting in the interview room alone. It is not clear from the record where Daniels was or what transpired between 1:41 p.m. and the beginning of his interview with Detective Odom.

[7] Daniels's interview with Detective Odom was audio- and video-recorded. Portions of the interview were redacted pursuant to a stipulation between the State, Daniels, Clayton, and Render, and the redacted version was admitted at trial as State's Exhibit 1A. The recording shows that after Detective Odom left the room, Daniels sat quietly and began to cry, saying "I just want to hug my momma" and that he was "sorry." Approximately 15 minutes later, Investigator Harralson entered the room and spoke with Daniels about some other uncharged property crimes before exiting the room. A few minutes later, Detective Odom returned to the room and asked Daniels whether he knew a person depicted in a photograph. Detective Carden and Investigators Harralson and Austin came in and out of the room over the next few minutes questioning Daniels again. Although unclear from the recording, it appears that they were questioning him in regard to whether others had been involved in some of the crimes about which he had already been questioned. The video recording ended at 4:58 p.m. while Investigator Harralson was questioning Daniels. The record is unclear as to when this interview concluded. However, we note that Daniels's trial counsel stated repeatedly in his closing argument that the interviews on January 11 lasted

8

2. In related enumerations of error, Daniels argues that his statements to the police should have been excluded at trial. For the reasons set forth below, we disagree with these contentions.

(a) Daniels first argues that his statements to the police should have been excluded because the officers who arrested and interviewed him did not comply with OCGA § 15-11-502 (a) (3). That section of the Juvenile Code provides, in relevant part:

> A person taking an alleged delinquent child into custody, with all reasonable speed and without first taking such child elsewhere, shall . . . [b]ring such child immediately before the juvenile court or promptly contact a juvenile court intake officer. . . .

OCGA § 15-11-502 (b) provides an exception to this requirement. Subsection (b) provides that, notwithstanding the general rule of subsection (a),

> . . . a law enforcement officer may detain an alleged delinquent child for a reasonable period of time sufficient to conduct interrogations and perform routine law enforcement procedures including but not limited to fingerprinting, photographing, and the preparation of any

"five and a half hours," and that Daniels's briefs before this Court indicate that the interviews lasted "roughly" six hours. Those characterizations, at least as to the starting and ending times, are generally consistent with the timeline established by the audio and video recordings of the interviews.

9

necessary records.

Daniels argues that his detention for questioning violated these provisions of the Juvenile Code because he was not brought before a juvenile court until the next day.

Daniels did not object to the admission of his incriminating statements on this basis at trial. He did so for the first time in his amended motion for new trial. Thus, his claim is subject to review on appeal only for "plain error[ ] affecting substantial rights[.]" OCGA § 24-1-103 (d). To show plain error regarding the admission of evidence, the appellant must satisfy a four-part test:

> First, there must be an error or defect — some sort of deviation from a legal rule — that has not been intentionally relinquished or abandoned, i.e., affirmatively waived, by the appellant. Second, the legal error must be clear or obvious, rather than subject to reasonable dispute. Third, the error must have affected the appellant's substantial rights, which in the ordinary case means he must demonstrate that it affected the outcome of the trial court proceedings. Fourth and finally, if the above three prongs are satisfied, the appellate court has the discretion to remedy the error — discretion which ought to be exercised only if the error seriously affects the fairness, integrity or public reputation of judicial proceedings.

(Citations and punctuation omitted.) *Gates v. State*, 298 Ga. 324, 327 (3) (781 SE2d 772) (2016).

Although the application of the exception set forth in OCGA § 15-11-502 (b) appears to be a matter of first impression for this Court,[8] subsection (b) plainly authorized the police to detain and interrogate Daniels for a reasonable period of time after his arrest. And we cannot say that a period of roughly five-and-a-half to six hours was an obviously unreasonable time for interrogation in this case, particularly given the range and number of incidents about which Daniels was questioned by the police.

Daniels also asserted in his amended motion for new trial and in his brief before this Court that he was first brought before the juvenile court at 1:30 p.m. on January 12, the day after his interviews with the police. However, Daniels points to nothing in the record to support that assertion, nor does he even assert what

---

[8] OCGA § 15-11-502 (a) (3) was carried forward from Georgia's former Juvenile Code. See former OCGA § 15-11-47 (a) (3). However, subsection (b) first appeared in the Juvenile Code in 2014 as part of House Bill 242, the General Assembly's wholesale revision and reorganization of the Juvenile Code. See Ga. L. 2013, pp. 294, 417, § 1-1 (effective Jan. 1, 2014).

11

happened during the intervening hours, such as whether a juvenile court intake officer was contacted. Thus, he has not shown that any such delay was obviously unreasonable, such that it was an obvious error under OCGA § 15-11-502 (b).

For these reasons, Daniels cannot show that the trial court made a clear and obvious error by not excluding his statements at trial due to a violation of the Juvenile Code. Accordingly, this enumeration of error fails.

(b) (i) Daniels also argues that he did not knowingly and voluntarily waive his constitutional rights before making the incriminating statements and that they should have been excluded by the trial court under the test set forth in *Riley v. State*, 237 Ga. 124 (226 SE2d 922) (1976). We see no error in the trial court's admission of these statements on that basis.

> In evaluating whether a juvenile defendant knowingly and voluntarily waived his rights during an interrogation, the State bears the burden of showing by a preponderance of the evidence that the juvenile understood and waived his rights under the totality of the circumstances.

12

(Punctuation omitted.) *Bedford v. State*, 311 Ga. 329, 334 (3) (857 SE2d 708) (2021). We have said that courts are to consider nine factors in making that determination:

> "(1) age of the accused; (2) education of the accused; (3) knowledge of the accused as to both the substance of the charge and the nature of his rights to consult with an attorney and remain silent; (4) whether the accused is held incommunicado or allowed to consult with relatives, friends[,] or an attorney; (5) whether the accused was interrogated before or after formal charges had been filed; (6) methods used in interrogations; (7) length of interrogations; (8) whether [or not] the accused refused to voluntarily give statements on prior occasions; and (9) whether the accused has repudiated an extra judicial statement at a later date."

*Lester v. State*, 310 Ga. 81, 85 (2) (849 SE2d 425) (2020) (quoting *Riley*, 237 Ga. at 128).[9]

"Although we independently apply the law to the facts, the trial court's determinations and factual findings must be upheld on

---

[9] We noted in *Lester* that even though *Riley* was decided in the limited context of whether a juvenile defendant voluntarily waived his *Miranda* rights, this Court has also relied on the *Riley* factors in evaluating whether, under the totality of the circumstances, a juvenile's confession was given voluntarily as a matter of due process, which is a separate inquiry. See *Lester*, 310 Ga. at 85 (2) n.7 (citing *Oubre v. Woldemichael*, 301 Ga. 299, 305 (2) (a) (800 SE2d 518) (2017); *Murray v. State*, 276 Ga. 396, 397-398 (2) (578 SE2d 853) (2003); *Jackson v. State*, 272 Ga. 191, 195 (3) (528 SE2d 232) (2000)).

appeal unless clearly erroneous." *Bedford*, 311 Ga. at 334 (3). However, where, as here, recordings of the custodial interviews are part of the appellate record, this Court "may also consider facts that definitely can be ascertained exclusively by reference to evidence that is uncontradicted and presents no questions of credibility, such as facts indisputably discernible from audio- or video-recordings." (Citation and punctuation omitted.) *Dawson v. State*, 308 Ga. 613, 619 (3) (842 SE2d 875) (2020). Moreover, the trial court is not required to make explicit findings on the record as to each of the *Riley* factors so long as it is clear from the record that the trial court applied the factors in reaching its determination. See *Green v. State*, 282 Ga. 672, 674 (2) (653 SE2d 23) (2007).

(ii) On Daniels's motion, the trial court held two *Jackson-Denno* hearings[10] regarding the admissibility of Daniels's statements to the police. According to the evidence presented in the first of those hearings, which was conducted just before jury selection, Daniels was arrested at his home around 9:45 a.m. on

---

[10] See *Jackson v. Denno*, 378 U.S. 368 (84 SCt 1774, 12 LE2d 908) (1964).

14

January 11. His mother was present in the home when Daniels was arrested, and she testified that "probably like ten" officers came to her house with guns drawn to arrest Daniels. According to Daniels's mother, one of the officers, whom she could not later identify, told her that as long as Daniels "cooperated," he would "come home," but that there would be "consequences" if he did not. According to his mother, Daniels was standing two or three feet away when the officer said this to her. Daniels was then taken to a police station. He called his mother about an hour or two later. When they spoke, according to his mother, Daniels was crying and was "hysterical." That call was the only time Daniels spoke with his mother that day. Daniels's mother never asked to come to the police station to be with Daniels.

Following his arrest, Daniels gave a series of interviews with several detectives that day. At the hearing, Detective Odom testified that he assisted another detective with the investigation of the home invasion and shooting at Moore's house on Curry Street and, as part of that investigation, interviewed Daniels beginning at 3:25 p.m. A

video recording of Detective Odom's interview of Daniels was played for the trial court. Detective Odom began by discussing a juvenile advice-of-rights form with Daniels, a copy of which was admitted at the hearing.[11] After Daniels was advised of his rights, he stated that he understood them. Detective Odom testified that Daniels did not appear to be confused or disoriented. Detective Odom had learned that Daniels was 14 years old, and Daniels told Detective Odom that he was in the ninth grade in school. After their discussion, Daniels signed next to the portion of the form indicating that he had read his rights, that he understood them, that he was willing to waive his rights and answer questions without an attorney present, that he understood what he was doing, that no promises or threats had been made, and that no pressure had been used against him.

Detective Odom testified that he was trying to build a "rapport"

---

[11] The juvenile advice-of-rights form used by Detective Odom was the same form used by Detective Carden, as described in footnote 3 above. Detective Odom testified that the advice-of-rights form for juveniles is different from the form used for adults. Detective Odom testified that the juvenile form contains a series of parentheticals that "interpret" statements regarding the suspect's rights into simpler language.

with Daniels and that he made no threats, promises, or offers of rewards and gave no hope of benefit or inducements to get Daniels to speak with him. In the interview, Daniels first told Detective Odom that he had nothing to do with the burglary at Curry Street and then suggested that some other people had been involved. Detective Odom said that he did not believe Daniels and explained that he had evidence that Daniels and Render were involved in the Curry Street burglary. Detective Odom then told Daniels that he should "think about" his mother and whether, if someone burglarized her house, he would want that person to tell the truth about what happened. After that exchange, Daniels admitted that he was involved in the burglary but accused Render of shooting Moore. Detective Odom then told Daniels that Moore had died. Daniels said that the burglary was a "random lick." He and Detective Odom then discussed what Daniels and Render did with the proceeds of the robbery.

Daniels's mother was not present for the interview, and Detective Odom testified that he did not contact her. According to

17

Detective Odom, Daniels never asked to speak with his mother or a lawyer and never asked for food or a break. Detective Odom testified that once he concluded his interview of Daniels, he "turned [Daniels] back over" to the other detectives. Detective Odom did not know if Daniels had been given any breaks during the day, but he testified that persons being interviewed are offered food and drinks and given bathroom breaks upon request.

At the conclusion of the first *Jackson-Denno* hearing, the trial court ruled from the bench that, considering the totality of the circumstances, Daniels's statements to Detective Odom were made after a knowing and voluntary waiver of his constitutional rights, noting specifically that it had considered "the mode, method, duration, manner, and conditions of interrogation, the defendant's educational level, and the evidentiary record that Mr. Daniels has chosen to provide." Based on that determination, the court ruled that, subject to other objections, Daniels's incriminating statements

could be admitted at trial.[12]

The next day, following the presentation of the State's first two witnesses, the trial court held a second *Jackson-Denno* hearing. In that hearing, Detective Carden was called to testify, and a video recording of Detective Carden advising Daniels of his constitutional rights and completing an advice-of-rights form was played for the trial court. The advice-of-rights form was admitted into evidence at the hearing. Detective Carden began interviewing Daniels around 11:40 a.m. on January 11, 2018, and he spoke with Daniels for about 20 minutes. Detective Carden testified that Daniels did not appear to be under the influence of any substances at the time and did not appear to be confused about what was happening when Detective Carden advised him of his rights. Detective Carden testified that he did not threaten, coerce, or force Daniels to make any statements and that he did not make any offers of rewards or inducements to him. Detective Carden testified that he never told Daniels he would

---

[12] The only testimony received by the trial court at this hearing was from Detective Odom and Daniels's mother.

19

get to go home and that Daniels appeared to understand what was going on, appeared to understand his rights, and that he waived his rights.

When Detective Carden began interviewing Daniels, two other detectives were in the room, but one of them left following the giving of the *Miranda* warnings.[13] Detective Carden informed Daniels that each of the detectives had charges against him that they wanted to discuss and showed him folders containing several arrest warrants. Daniels indicated that he was 14 years old and was in the ninth grade at the time of the interview. Detective Carden asked Daniels if he had problems reading or writing, and Daniels said he did not.

After the advisement of rights, Detective Carden explained to Daniels that he could help himself by being truthful and then explained to Daniels that although he had "a lot of charges" he could be "exceptionally cleared." Detective Carden explained to Daniels that "exceptionally cleared" is when the police find a person who is

---

[13] Detective Carden admitted on cross-examination that having more than two officers present for an interrogation violated Columbus Police Department procedures.

responsible for a case but choose not to charge them with it. Detective Carden explained that this was common in cases where a person has committed multiple "property" crimes. He gave an example of someone who had broken into 100 cars. Detective Carden explained that if a suspect is dishonest he might be charged with all of the crimes but that if the suspect is honest "he might catch five or six of them instead of a hundred."

Daniels interrupted Detective Carden's explanation and said, "So what you're saying is, 'If I help you, you help me.'" Detective Carden replied, "Yes, that's what I'm saying." Detective Carden then explained that "near every detective up here" had cases on Daniels. Detective Carden next asked Daniels about a number of vehicle break-ins that were unrelated to this case. As Detective Carden was wrapping up his questioning, he said, "That pretty much clears up my entering autos." Daniels then said, "Like we said, if I help you, you help me." Detective Carden replied:

> Yes, sir, we will. You're not going to get charged with breaking into any cars at these other two apartment complexes. The stuff I've got charged on you now, that's

there. We'll help you out with that in court. We'll make our recommendation to the district attorney, and all that stuff. OK. That's gonna be my case. Between me and her we'll talk about it, and we'll figure out something for you. But any of this stuff you've been telling us about this stuff you've been doing, I have no qualms — I'm not gonna charge you with it.

Detective Carden then asked Daniels about some other thefts unrelated to this case. Investigator Harralson was present during that questioning and, as Detective Carden was leaving the room, began questioning Daniels about the theft of a Toyota Tacoma and an Acura and other thefts unrelated to this case.

At the *Jackson-Denno* hearing, Detective Carden testified that "[e]xceptionally cleared is when we just choose to not prosecute on certain cases due to the number of property crimes." Detective Carden further testified that the police sometimes "have people confess to 30 or 40 [crimes]. And we exceptionally clear some of them and move forward with the rest of them." Detective Carden later stated that this discussion with Daniels was a way of asking Daniels

to give truthful statements.[14]

Detective Carden further testified as follows. When Daniels was arrested, "pretty much the entire burglary and theft unit," or "roughly nine detectives," came to Daniels's house because they were looking for several people at the time in connection with a series of property crimes. Detective Carden approached the house in a "ready position," meaning that his weapon was drawn but not necessarily pointed at anyone. Daniels was called out of one of the back bedrooms of the house, was eventually handcuffed, and was then transported to a police station. Detective Carden testified that officers are required to feed suspects and give them bathroom breaks when they are being held for questioning.

At the close of the second *Jackson-Denno* hearing, the trial

---

[14] At trial, Detective Carden also testified as follows:

> Exceptionally cleared is when we have somebody say they're charged with breaking into, say a hundred cars. We don't charge them with all of them. We just charge them with the most serious ones, the entering autos. And basically if they confess to it and they cooperate, we don't charge them with all of them. We just charge them with a few of them.

Detective Carden testified that his investigation involved break-ins that are not part of this case.

court again ruled from the bench, finding by a preponderance of the evidence that Daniels's statements to the police were "freely and knowingly given without hope or expectation of benefits or threat of harm or coercion."

Daniels again challenged the admissibility of his statements in his amended motion for new trial, which he filed through new counsel. There, Daniels argued that additional evidence about the interrogations that came out at trial, including the fact that Daniels was interrogated by as many as six investigators or detectives throughout the day on January 11, showed that Daniels's waiver of his rights was not knowing and voluntary.[15]

---

[15] Daniels included, as an exhibit to his amended motion, a psychological evaluation that had been prepared by an examiner from the Georgia Department of Behavioral Health and Developmental Disabilities in conjunction with the transfer of Daniels's case from juvenile court to superior court. The motion highlighted portions of the report showing that Daniels was likely "functioning within the Low Average-Borderline range of intelligence," that his IQ is between 73 and 85 and that his "overall pattern of performance reflected lower than average ability" to verbalize his thoughts, elaborate on responses, and "identify concrete and abstract relationships between words and concepts." The report also noted that individuals with profiles similar to Daniels present with "significant anxiety and tension" and an inability to meet minimal expectations without feeling overwhelmed. The report noted that Daniels had a history of behavioral issues that began in elementary school and

In his motion, Daniels also argued that the trial court had not correctly applied the *Riley* factors, as its verbal rulings after the *Jackson-Denno* hearings referenced the court's findings that Daniels's statements were made "freely and voluntarily" rather than that they should be admitted under the nine factors set forth in *Riley*. The trial court rejected this argument and denied Daniels's motion for new trial.

(iii) On appeal, Daniels again argues that the trial court erred by not outlining specific findings as to the *Riley* factors in its verbal rulings and in its order denying Daniels's motion for new trial. However,

> we generally do not require trial courts to make specific, on-the-record findings about each aspect of the totality of

continued into middle school. The report indicated that Daniels was last enrolled in ninth grade but had transferred to an alternative school at the beginning of the most recent school year. His school attendance was also inconsistent. The report concluded that there was "no evidence of serious cognitive deficits such that [Daniels] would be committable as a mentally impaired individual" and that Daniels's "history of academic difficulties appears related to his history of disruptive behavior and low motivation towards academic pursuits." This evaluation, however, was not admitted into evidence at either *Jackson-Denno* hearing, at trial, or at the hearing on Daniels's motion for new trial, and Daniels has raised no claim that his trial counsel provided ineffective assistance by failing to present the evidence of the evaluation.

25

the circumstances they evaluate or to make explicit factual findings or credibility determinations on the record. Indeed, unless clearly erroneous, a trial court's credibility determinations and factual findings relating to the admissibility of a confession, whether explicit or implicit, must be upheld on appeal, although we independently apply the law to the facts.

(Citations and punctuation omitted.) *Lester*, 310 Ga. at 86 (2). So long as the record is "sufficient to support the court's conclusion that [the] defendant knowingly and voluntarily waived his right to counsel and that his statements were properly admitted at trial under the *Riley* test," the trial court need not detail its application of the *Riley* factors. (Citation and punctuation omitted.) Id.

Here, despite Daniels's contention to the contrary, it is clear from the record of the *Jackson-Denno* hearings, the hearing on Daniels's motion for new trial, and the trial court's order denying that motion that the trial court was aware of and considered the *Riley* factors in making its determination. See *Bedford*, 311 Ga. at 334-335 (3). Daniels's *Jackson-Denno* motion cited *Riley*, and Daniels's trial counsel and the prosecutor outlined the State's burden of proof and the nine *Riley* factors for the trial court during

26

arguments at both *Jackson-Denno* hearings. Defense counsel also noted Daniels's age and education level, the circumstances of his arrest, the length and method of his interrogation, the fact that his mother was not present, and evidence regarding breaks and food Daniels received to argue that his statements to the police should have been excluded under *Riley*. In response, the State argued that the *Riley* test had been satisfied. Thus, there is no question that the trial court was aware of and applied the *Riley* factors in reaching its determination.

(iv) Daniels also argues at length that the trial court misapplied the *Riley* factors in reaching its conclusion that his statements were admissible. We disagree.

Reviewing the nine *Riley* factors in order, we first note that the record shows that Daniels was 14 years old when he was interviewed by the police (the interviews took place the day before Daniels's fifteenth birthday).[16] During his interviews, Daniels told the police

---

[16] Daniels's birthday, as listed on the advice-of-rights forms he read and signed with Detectives Carden and Odom, is January 12, 2003.

that he was in the ninth grade in school and that he could read and write. See *Love v. State*, 309 Ga. 833, 838 (2) (848 SE2d 882) (2020).[17]

Daniels was given the *Miranda* warnings twice on January 11 through the use, both times, of an advice-of-rights form designed specifically for juveniles. Both times, he waived his rights by signing the form and answered questions from the officers. Daniels was also advised by Detective Carden at the outset of the interview that he was being questioned in regard to a series of vehicle thefts and break-ins and eventually admitted to Investigators Harralson and Austin that he had been involved in the thefts of a Toyota Tacoma, an Acura, and a Buick, as well as a shootout in Belvedere Park. Similarly, when Detective Odom began questioning Daniels, he advised him that he wanted to know about the break-in at Moore's house that culminated in Moore's shooting.

Daniels notes that his mother was not present for his

---

[17] As noted above, Daniels provided the trial court with the report of a psychological evaluation of him as an exhibit to his amended motion for new trial. However, the report was not admitted into evidence at either *Jackson-Denno* hearing or the hearing on Daniels's motion for new trial.

interviews, that he was not advised that she could be present, and that she was never notified that she could be present. However, the record indicates that his mother was present when he was arrested. And according to her testimony at the first *Jackson-Denno* hearing, she also spoke with him on the phone "an hour or two" after he was arrested.[18] Neither Daniels nor his mother ever asked that she be present while he was being interviewed. We have previously noted that "[a] parent's presence, although not required, is a significant factor in support of a finding of waiver." *Norris v. State*, 282 Ga. 430, 431 (2) (651 SE2d 40) (2007). However, this factor is not determinative as to this *Riley* factor or the analysis as a whole. See *Lester*, 310 Ga. at 88 (2); *Love*, 309 Ga. at 838 (2). We also note that the record supports the trial court's finding that Daniels never asked to speak with an attorney or anyone else during the interviews. Thus, there is no evidence that Daniels was held incommunicado.

---

[18] There appears to be no other evidence that this call took place. Because this call is not seen on the first video-recorded interview, if it happened in the timeframe described by Daniels's mother, it must have occurred, if at all, before the interviews started about two hours after Daniels's arrest.

*Riley* also requires the court to consider the timing of the charges against Daniels, specifically whether Daniels was interrogated before or after formal charges were filed. The record makes clear that Daniels was interviewed before he was indicted. The interviews took place on January 11, 2018, and he was not indicted until July 10, 2018. However, Daniels was advised at the outset of his interview with Detective Carden that he had several warrants pending relating to various "property" crimes. Later, Detective Odom advised Daniels that he wanted to speak to him about the burglary at Curry Street before asking Daniels any questions.

Daniels also asserts that the environment of his questioning was intimidating and threatening. The record shows that Daniels was arrested at his home by a team of officers (at least one of whom had his gun drawn), but the interviews began one to two hours later at the police station and were conducted by officers who were not displaying weapons while questioning him. As noted above, Daniels was questioned by multiple officers in a series of interviews the

30

same day, during which he made multiple inculpatory statements regarding the thefts of several vehicles and the burglary that culminated in Moore's shooting.

The record shows that Detective Carden and Investigators Harralson and Austin interviewed Daniels from 11:40 a.m. until about 1:20 p.m. At some point that afternoon, he was moved to a different interview room at the police station and was interviewed by Detective Odom from 3:25 to 4:00 p.m. The record shows that he then spoke with Detective Carden and Investigators Harralson and Austin in the interview room. Daniels was speaking with Investigator Harralson just before 5:00 p.m. when the recording ended. Although our cases do not suggest that there is a limit on the amount of time for which a juvenile can be questioned, we have noted that an interview was "relatively lengthy" where the juvenile suspect was questioned for two-and-a-half hours and held in an interrogation room for more than four hours. *Oubre v. Woldemichael*, 301 Ga. 299, 305 (2) (a) (800 SE2d 518) (2017).

According to Daniels's mother, he called her "an hour or two"

31

after his arrest and was "hysterical." The video recording of the interview with Detective Odom also showed Daniels crying after he admitted being involved in the Curry Street burglary and after Detective Odom left the interview room. That he was upset during his call with his mother and was seen crying after his interview with Detective Odom does not show that the interrogation was abusive. The detectives testified that it was standard practice to provide snacks and bathroom breaks upon request. Investigator Austin also testified that he was informed that Daniels was given pizza and something to drink at the police station, and nothing in the record suggests that Daniels asked for other food or drink and was denied access to them. Likewise, nothing in the record suggests that Daniels asked for breaks or was denied them. Moreover, nothing suggests that the presence of more than one officer during portions of his interview was unduly coercive or intimidating. See *Norris*, 282 Ga. at 432 (2) (noting that even though the juvenile suspect became upset and began to cry when confronted with accusations, there was no evidence that the interrogation was abusive); *Chapman v. State*,

32

273 Ga. 865, 870 (4) (a) (548 SE2d 278) (2001) (upholding trial court's admission of juvenile statement where there was no evidence that the interrogations were abusive or overly long).

There is no evidence in the record that Daniels had ever previously refused to voluntarily give a statement to the police or that he ever repudiated the statements he made to the police in this case. See *Love*, 309 Ga. at 838 (2). Daniels asserts on appeal that entering a plea of not guilty constituted a repudiation of his statements, but we reject that assertion. See *Norris*, 282 Ga. at 432 (2) (noting that defendant, who pled not guilty, did not recant confession until trial).

Daniels also asserts that the police officers made promises to him in exchange for his statements. First, as to the statement allegedly made by one of the officers that Daniels would be allowed to "come home" if he cooperated with the police, Daniels's mother testified that an officer, whom she could not identify, said this to her during Daniels's arrest while Daniels was standing a few feet away. But it is not clear that Daniels heard or understood this comment,

as it was directed to his mother, not to him. Although the trial court made no explicit finding on this point, it was authorized to determine that the statement, if made, was not heard by Daniels. Moreover, in his testimony, Detective Carden denied that he ever promised Daniels that he could go home. The trial court could thus determine that Daniels was never promised that he would be allowed to go home if he cooperated. See *Murphy v. State*, 267 Ga. 100, 102 (7) (475 SE2d 590) (1996) ("The trial court was entitled to determine the credibility of the witnesses and to believe the officers.").

We turn next to statements made to Daniels during his interviews at the police station. Detective Carden made several statements to Daniels about being "exceptionally cleared" if Daniels told the truth about "property" crimes Daniels had been involved in. Detective Carden also told Daniels that he would help Daniels with the charges Daniels faced if Daniels told the truth. It was after these statements by Detective Carden that Daniels made inculpatory statements to Investigators Harralson and Austin regarding the

34

thefts of the Tacoma, Acura, and Buick and the shootout at Belvedere Park. According to the police, those statements helped to link Daniels to the burglary and shooting at Moore's house, his role in which he confessed to Detective Odom later in the day.

While Detective Carden's statements suggested to Daniels that his cooperation and truthfulness regarding the uncharged "property" crimes he had been involved in would result in Daniels being charged with fewer crimes, and thus may have constituted a "hope of benefit" under Georgia law, see OCGA § 24-8-824, these assurances by Detective Carden were not determinative as to the "methods of interrogation" factor or the *Riley* test as a whole.[19] See

---

[19] We note that Daniels never challenged the admission of his custodial statements under OCGA § 24-8-824, the Georgia statute which provides that "[t]o make a confession admissible, it shall have been made voluntarily, without being induced by another by the slightest hope of benefit or remotest fear of injury." Instead, Daniels repeatedly argued only that his statements should have been excluded as being in violation of the requirements *Miranda* established under the United States Constitution using the *Riley* test applicable to juvenile defendants.

We have suggested that the statute and the *Riley* test are intertwined such that a violation of the statute weighs strongly toward exclusion of the statements under *Riley*. See *Oubre*, 301 Ga. at 306-307 (2) (a). However, although *Oubre* indicated that the use of aggressive interrogation methods, including providing a hope of benefit, may be the "most significant[ ]" factor in

the *Riley* analysis, id. at 306 (2) (a), it did so while considering the *Riley* factors in the context of a federal due process analysis, rather than whether the juvenile defendant had voluntarily waived his rights under *Miranda*, which is at issue in this appeal.

Moreover, with regard to whether a defendant's inculpatory statement (rather than his waiver of his right against self-incrimination) was made voluntarily, OCGA § 24-8-824 and the *Riley* test actually provide separate paths for suppressing the statement. We have noted this distinction in the context of interrogations of adult suspects. See *Matthews v. State*, 311 Ga. 531, 542 (3) (b) (858 SE2d 718) (2021) (contrasting constitutional question of whether a confession is inadmissible as a violation of due process because it was not voluntary under the totality of the circumstances with OCGA § 24-8-824, which "involves 'a narrowly focused test, that presents 'a single question' targeted at 'the reliability — the truth or falsity — of [the defendant's] confession.'" (quoting *State v. Chulpayev*, 296 Ga. 764, 779 (3) (b) (770 SE2d 808) (2015)). As we discussed in *Chulpayev*, with regard to adult confessions, "our decisions have sometimes conflated the analysis of whether a confession is voluntary under the statutory standard with the analysis of whether the confession is voluntary under the constitutional due process standard." 296 Ga. at 779 (3) (b). We noted that "[t]his imprecision may stem from the fact that proof that a defendant's incriminatory statement was induced by a hope of benefit or fear of injury in violation of OCGA § 24-8-824 is generally significant proof that his constitutional [due process] rights were also violated." Id. When a defendant challenges the admission of his statement under OCGA § 24-8-824, the statement must be excluded by the trial court if the statement was induced by a hope of benefit. See *Chulpayev*, 296 Ga. at 777 (3) (b) ("There is no doubt that the statutory text mandates the exclusion from evidence of incriminatory statements obtained in violation of the statute at trial."). Of course, admission of a defendant's statement under OCGA § 24-8-824 is also subject to harmless-error review. See *Budhani v. State*, 306 Ga. 315, 328-329 (2) (d) (830 SE2d 195) (2019). Moreover, "a violation of OCGA § 24-8-824 is not *automatically* a federal [due process] violation too, because the tests for determining the voluntariness of a confession under the statute and under the Constitution are not the same." (Emphasis in original.) *Chulpayev*, 296 Ga. at 779 (3) (b); see also *United States v. Lall*, 607 F3d 1277, 1285 (II) (A) (3) (11th Cir. 2010) (noting that "a per se rule that would render a confession involuntary [as a matter of due process] if it was preceded by 'any direct or implied promises, however slight,' has been rejected by the Supreme Court." (citing *Arizona v. Fulminante*, 499 U. S. 279, 284-285 (I) (111 SCt 1246, 113

*Oubre*, 301 Ga. at 306 (2) (a) ("[O]ffering a hope of benefit is a method of interrogation, a factor to be considered in evaluating the totality of the circumstances under *Riley*.").

We note in this regard that Detective Carden's discussion of the "exceptionally cleared" concept was clearly limited to uncharged "property" crimes such as vehicle break-ins and thefts, not serious felonies like home burglary, aggravated assault, or murder. Moreover, in contrast to Detective Carden's statements suggesting that Daniels would receive fewer charges if he cooperated, Detective Carden's comments about Daniels helping himself by telling the truth and recommending leniency to the prosecutor are not considered a hope of benefit under OCGA § 24-8-824. See *Dawson*,

---

LE2d 302) (1991)).

A similar distinction applies in the context of determining whether a juvenile defendant knowingly and voluntarily waived his rights under *Miranda* and *Riley*. Where, as Daniels did in this appeal, a juvenile defendant argues only that a custodial statement should be excluded under the federal constitutional requirements of *Miranda* and *Riley*, the court can consider whether the police provided a hope of benefit that induced his confession. Whether the police used aggressive interrogation methods, including providing a hope of benefit, is only one of the many factors that the courts consider under *Riley*. And as we have stated, no one factor is necessarily determinative in the *Riley* analysis.

308 Ga. at 621-622 (3) (determining that statements by interviewing officer imploring suspect to "tell the truth" and "help himself" do not violate OCGA § 24-8-824 and that "it is permissible for a detective to tell the accused that the detective will inform the district attorney or trial court about the accused's truthfulness and cooperation, so long as the detective does not promise a hope of benefit"). Daniels has pointed to nothing in the record showing that the officers who interviewed Daniels after Detective Carden and elicited his admissions as to the crimes charged in this case — including Detective Odom, who spoke to Daniels after a roughly two-hour break — made any statements that constitute a hope of benefit under the statute.[20] Compare *Oubre*, 301 Ga. at 306 (2) (a) (focusing on the interviewing officers' offer of reduced charges for the shooting for which the juvenile was later indicted).

Thus, although some factors weigh against the trial court's

---

[20] During his trial testimony, Detective Odom was asked by Daniels's counsel if he explained the term "exceptionally cleared" to Daniels during his interview. Detective Odom replied that he did not because he "wasn't exceptionally clearing anything."

ultimate determination that Daniels's statements were admissible under *Riley*, we cannot say that the trial court erred. Daniels, who the record shows was nearly 15 years old and could read and write, was clearly advised of his rights two times and appeared to understand them. And although his interviews were fairly lengthy, there is nothing in the record to suggest that he was coerced, intimidated, threatened, or held incommunicado by the police. He was permitted to speak with his mother and was given food and drink at the police station. He never asked to speak with a lawyer or anyone else. Under these circumstances, we cannot say that the trial court erred in concluding that, under the totality of the circumstances, Daniels made a knowing and voluntary waiver of his *Miranda* rights under the *Riley* factors. See *Bedford*, 311 Ga. at 334 (3) (no trial court error in admitting incriminating statements where, despite defendant's age and low level of education, he was informed of charges against him and his *Miranda* rights, was not held incommunicado or for a very long time, was not prohibited from consulting with relatives or an attorney, and was not abused or

oppressed during questioning). Compare *State v. Lee*, 298 Ga. 388, 389 (782 SE2d 249) (2016) (trial court properly concluded based on the totality of the circumstances that 15-year-old defendant did not knowingly and intelligently waive his rights where video recording showed that defendant, who was at the police station for ten hours and extremely distraught, never signed the waiver form, never expressed an understanding of his rights, and appeared to have minimal capacity to understand what little the investigators attempted to communicate regarding his rights).

*Judgment affirmed. All the Justices concur, except Nahmias, C. J., Boggs, P. J., and Warren, J., who concur specially as to Division 2 (b).*

NAHMIAS, Chief Justice, concurring specially in part.

I join Divisions 1 and 2 (a) of the Court's opinion in full. As for Division 2 (b), in which the Court upholds the trial court's ruling that Daniels voluntarily waived his *Miranda* rights under the special *Miranda*-waiver test for juvenile defendants set forth in this Court's *Riley* decision, I have doubts about how a trial court is to make, and an appellate court is to review, a ruling based on a *nine-factor*, totality-of-the-circumstances test.[21] Applying that test as best

---

[21] See, e.g., David Kwok, Is Vagueness Choking the White-Collar Statute?, 53 Ga. L. Rev. 495, 523 (2019) ("Multifactor balancing tests incorporate a number of discrete elements, and the relationship between the elements is not transparent. An element might overlap significantly with another element, and it may be unclear how much weight any particular element carries. This indeterminate relationship can create uncertainty. Multipart balancing tests may be useful [for] post-hoc explanation or justification of a decision, but they are less useful in providing future guidance." (footnotes omitted)); Antonin Scalia, The Rule of Law as a Law of Rules, 56 U. Chi. L. Rev. 1175, 1182 (1989) ("[A]t the point where an appellate judge says that the . . . issue must be decided on the basis of the totality of the circumstances, or by a balancing of all the factors involved, he begins to resemble a finder of fact more than a determiner of law. . . . And to reiterate the unfortunate practical consequences of reaching such a pass when there still remains a good deal of judgment to be applied: equality of treatment is difficult to demonstrate and, in a multi-tiered judicial system, impossible to achieve; predictability is destroyed; judicial arbitrariness is facilitated; judicial courage is impaired.").

41

I can, I think the question is closer than the Court's opinion indicates. But I cannot say that the Court reaches the wrong result, particularly given the way Daniels' case has been litigated.

As discussed in footnote 19 of the Court's opinion, Daniels has challenged the admissibility of his statements based on a claim regarding the voluntariness of his waiver of *Miranda* rights, rather than a claim regarding the voluntariness of his actual statements under the Constitution (like the claim made in *Oubre*) or, even more conspicuously, under Georgia's statute rendering inadmissible confessions that are "induced by . . . the slightest hope of benefit[,]" OCGA § 24-8-824. In addition, footnote 15 of the Court's opinion indicates that evidence of Daniels' limited intellectual capacity, which is relevant to the *Riley* test, was available but was not mentioned during the suppression hearings at trial and was not actually offered into evidence during the motion for new trial hearing. Moreover, as outlined in the Court's opinion and mentioned in its footnote 4, the evidence presented to the jury regarding Daniels' interviews was replete with discussion of criminal acts of

42

which he was accused by the police but not charged in this case, yet no challenge to that evidence under OCGA § 24-4-404 (b) was made at trial or on appeal. All of these issues could affect the admissibility of some or all of Daniels' statements to the police. Why his trial counsel and appellate counsel litigated the case as they did, I do not know. But this Court must decide his appeal based on the claims he has raised and the evidence he has offered to support them. And for that reason, I join the Court's result as to Division 2 (b).

I am authorized to state that Presiding Justice Boggs and Justice Warren join in this special concurrence.

Decided March 8, 2022.

Murder. Muscogee Superior Court. Before Judge McBride.

*Wadkins & Wallace, Robert L. Wadkins, Jr.*, for appellant.

*Mark P. Jones, District Attorney, Frederick Lewis, Assistant District Attorney; Christopher M. Carr, Attorney General, Patricia B. Attaway Burton, Deputy Attorney General, Paula K. Smith, Senior Assistant Attorney General, Parisa F. Sarfarazi, Assistant Attorney General*, for appellee.