301 Ga. 299
FINAL COPY

S17A0656.  OUBRE v. WOLDEMICHAEL.

PETERSON, Justice.

Yididya Woldemichael pleaded guilty to armed robbery and other charges for his role in the robbery and beating of a pizza delivery woman.  He filed a petition for habeas corpus, which the habeas court granted on the basis that his trial counsel was ineffective for failing to advise Woldemichael that inculpatory custodial statements by him could have been suppressed.  Woldemichael was 14 years old at the time of the police interview.  The Warden appeals the grant of habeas relief, arguing that the statements were voluntary and would have been admissible at trial and, thus, counsel's performance was not deficient.  We agree with the habeas court that Woldemichael's statements to police were subject to suppression.  But because the habeas court assumed without separate analysis that recorded statements that Woldemichael made to a co-defendant during a break in police questioning also were subject to suppression, we remand for the habeas court to analyze the admissibility of those statements in the first instance.

1.    *Factual background*

In November 2010, Woldemichael was indicted with three others in connection with an August 2010 robbery. He was charged with three counts of armed robbery, two counts of aggravated assault, one count of false imprisonment, and one count of possession of a firearm during the commission of a felony. Woldemichael entered a non-negotiated guilty plea in September 2011 to all of the charges except for two of the armed robbery counts.[1]

At the plea hearing, the prosecutor told the court that she expected the evidence would show that the 60-year-old victim was badly beaten and robbed by three men, with a fourth man acting as a lookout, when she delivered pizza to an apartment. According to the prosecutor, Woldemichael answered the door before he and two others dragged the victim inside and proceeded to beat her. According to the prosecutor, the victim had reported that one of the men beat her with what she thought was a pipe — later determined to be a rifle or shotgun — and another waved a handgun. The prosecutor said one of the co-defendants, Gilbert Burton, told police that during the incident Woldemichael struck the

_____

[1] At the plea hearing, the prosecutor described the plea as "pretty much a non-negotiated plea" with a "cap."

2

victim repeatedly about the head and face with the shotgun as she lay on the floor.

At the plea hearing, the prosecutor repeatedly referenced law enforcement's interview of Woldemichael, as well as statements he made while he was left alone in the interview room with another co-defendant, Justin Tolbert, and laughter by Woldemichael about the victim while the two discussed the robbery. The trial court sentenced Woldemichael to 45 years, 20 years to be served in custody.

In 2014, Woldemichael filed a petition for a writ of habeas corpus. The sole claim in the petition is that Woldemichael would not have pleaded guilty but for the ineffective assistance of trial counsel. In particular, Woldemichael contends that trial counsel did not inform him of the likelihood that his custodial statements would have been excluded had counsel sought their suppression.

At issue is the videotaped interview in which Woldemichael spent more than four hours in a police interrogation room.[2] Woldemichael complains that

---

[2] The DVD shows that Woldemichael was in the interview room for about four-and-a-half hours, including two bathroom breaks. Police were in the room with Woldemichael for about two-and-a-half hours of that time period, and he was left with only the co-defendant for about 13 minutes. The Warden does not dispute that Woldemichael was in custody for the whole interview.

police repeatedly suggested to him that a confession would be to his benefit. Toward the end of the interview, after talking to his co-defendant, he acknowledged participating in the robbery.

In the first 30 minutes of the session, before Woldemichael had been apprised of his rights, two detectives questioned him. One of the detectives made the following remarks:

> I'm asking you to go ahead and just be completely honest with me. Because in the long run, it really helps us both if you're just honest with me and just tell me from the beginning and I can say, listen, it was just a 15 [sic] year old kid who did some stupid stuff and he made some stupid mistakes, OK? That's why you're here right now.

The detective continued later:

> We brought you in here for your own good, essentially. . . . We want you to tell us exactly what happened so we can go and we can say, "listen, these kids aren't just vicious animals that did this for no reason." . . . You think it's gonna be all your other buddies that were with you yesterday are just gonna keep the same story that you are, or you think they are gonna start diming you out and they start saying, "Yeah, he did this and he did that and he was this part of it?" And then we gotta go to court and we gotta say, "yeah, the other guys were honest, but this guy, he wasn't." We gotta say that to the judge. How do you think that's going to make you look? Pretty bad.

Woldemichael then was left alone for about 30 minutes, before another set

4

of detectives entered the room. Realizing that Woldemichael had not yet been read his <u>Miranda</u> rights, one of the detectives apparently left to get the appropriate <u>Miranda</u> paperwork. While he was gone, Woldemichael said to the other detective, "I don't feel like talking right now. I might just say I need a lawyer for real and let the lawyer talk for me. For real."[3] The officer answered, "That's your choice," and then continued asking questions after a brief pause.

The other detective returned and advised Woldemichael of his <u>Miranda</u> rights. One of the detectives again urged Woldemichael to cooperate so that the officers could speak on his behalf: "We've been talking to the other guys and we would like to hear your side, OK. Alright. Then we can go forward and say that, you know, you're an honest person and this is kind of a dumb mistake that really got out of hand." The detective continued later:

> Yididya, you're still a juvenile, OK. Now I can't make you any promises about what happens, OK. I'm not saying you will be definitely prosecuted as an adult. I'm not saying that. I'm saying it can happen, OK, depending on how heinous the crime is. Alright. There's been 10 year olds charged with murder before. OK. I'm just, I'm just saying that's possible and I can't make you any promises. OK. Put yourself in the position of the guy that's gotta

---

[3] Woldemichael does not argue that this statement amounted to an invocation of his right to silence or right to counsel.

make the decision, do that.

Woldemichael inquired in response, "Which guy who's gotta make a decision?"

The detective replied:

> Put yourself in the position of anybody who's gotta make a decision. And this is what you got on your hands. OK. You got one guy who sits down, confesses to this crime that he did, says he was sorry, helps you, helps you figure out what's going on, OK. . . . You got him, you got him dead to rights, he's on security camera. But you sit down and you say, hey, man, I know you did this. He confesses and he helps you. OK. Then you got the other guy, you got him on security camera. He's dead to rights, OK, but he sits there and says, "I didn't do it." You show him his picture. "It wasn't me." Which one of those guys do you want to work with? You know what I mean? I mean, clearly, you want to work with the guy who's been cooperative, OK, who's showed a little remorse. Who's showed he was a human being after all, and not some crazy monster, OK, that would plan this kind of thing.

The detectives then brought the 21-year-old Tolbert into the room and left him alone with Woldemichael, one detective telling the two, "You guys have differing versions of what's going on. You guys need to figure it out, so that way everyone can go and go where they need to go, today. So whatever you guys' decision is, whatever your story is, you need to let us know, and we're ready to go." Another detective told the two, "We want a resolution before we leave." Left alone, Tolbert and Woldemichael proceeded to discuss the robbery.

Tolbert told Woldemichael that he had told police he had seen the victim being beaten and that Woldemichael was supposed to be the lookout. Tolbert asked only a few questions of Woldemichael; when Woldemichael predicted that he would be incarcerated, Tolbert asked him why. Woldemichael replied that he didn't know, adding that he did not beat the victim. Woldemichael told Tolbert that he ran away after the victim began yelling. When Tolbert described the victim being beaten and dragged, Woldemichael began laughing. Woldemichael described her screams as "just annoying."

Eventually, the detectives came back.[4] Woldemichael proceeded to admit that he was present for the robbery and was the person who opened the door to the apartment, and he acknowledged the presence of a gun. But Woldemichael insisted he did not beat the victim.

As the officers attempted to persuade Woldemichael to name others involved, one detective told Woldemichael that he "got played today" — an apparent reference to Woldemichael falling for the tactic of recording Woldemichael's meeting with Tolbert. In the light of that, the detective told

---

[4] Tolbert remained in the interview room for several more minutes but left as the detectives' interrogation of Woldemichael continued.

Woldemichael, "[t]he only redeeming thing that you've got to offer is truthful statements about who the other two guys were." Woldemichael asked the detective how his cooperation would matter: "If I tell you who they is, if I don't tell you who they is, I'm still getting the same years, right? What's the difference?" The detective replied, "It makes a big difference how a judge looks at it, how a jury looks at it, how a prosecutor looks at it." The detective added that "[t]he difference is when a judge watches this video and he sees a guy who realized that he was wrong and made it right and told the truth." Saying the judge and jury were bound to agree that he was "a cold-hearted S.O.B.," the detective again said giving honest statements about the other perpetrators was "the only thing you've got left to offer." Woldemichael later asked one detective how many years he could expect to receive for his crime. "It starts at ten," the other detective replied. "It goes up from there. That's why I'm saying, when you walk out this door, you want this video to look as good as possible." The interrogation continued, with Woldemichael providing answers to some of the detectives' questions about the incident, until Woldemichael announced, "I'm done," and the detectives promptly left the room.

At a 2015 hearing on the habeas corpus petition, trial counsel testified that

8

he did not remember whether he had any concerns about the legality of the interrogation or recall discussing with Woldemichael any strategies for excluding his statements, saying he would have discussed it with the client if any such strategies existed. Trial counsel testified that even if he had concluded that the statements were subject to exclusion, "I don't know that I would have filed a motion for a Jackson-Denno hearing because I don't really want the judge to see that DVD[,]" adding, "there were scenes in there that would have disturbed the judge." He allowed that he might have used the interrogation issue in negotiating with the prosecutor handling the case, but said she was "upset" about the crime and "solid on 25" years and Woldemichael was "the one the D.A. wanted." Trial counsel testified that he "felt it was better to do a plea[,]" adding, "my understanding was one [co-defendant] at least was going to [testify against Woldemichael]."

Woldemichael also testified at the habeas hearing. He testified that he was repeating eighth grade at the time of his arrest, having previously failed it. He said his mother was not present when he was taken away for questioning, and he had no contact with her during the interview with police. He also testified

9

that he was under the influence of marijuana during the interview.[5] Woldemichael testified that trial counsel did not discuss with him any defenses or a potential motion to challenge the admissibility of his statements. Woldemichael also said that trial counsel advised him to plead guilty because he would be sentenced to "25 to life" if he went to trial. Woldemichael testified that he would have gone to trial if trial counsel had discussed with him the possibility of getting his statements suppressed.

The habeas court granted Woldemichael's habeas petition, ordering that his conviction and sentence be set aside. The habeas court found that Woldemichael's custodial statements would have been inadmissible at trial in their entirety and that trial counsel was ineffective in that he failed to challenge their admissibility and advise Woldemichael of the likelihood of their suppression. The habeas court also found that, but for that ineffective assistance, Woldemichael would have proceeded to trial. The Warden appealed on the basis that the habeas court erred in finding that counsel's performance was deficient.

---

[5] Although Woldemichael's recent drug use was discussed during the interrogation, he told detectives toward the end of the recorded interview that he was not high.

10

2. *Analysis*

Woldemichael challenges his guilty plea on the basis that he was denied effective assistance of counsel. See Strickland v. Washington, 466 U.S. 668, 686 (104 SCt 2052, 80 LE2d 674) (1984). A conviction based on a guilty plea may be challenged on the ground that defense counsel was ineffective. See Padilla v. Kentucky, 559 U.S. 356 (130 SCt 1473, 176 LE2d 284) (2010); Hill v. Lockhart, 474 U.S. 52 (106 SCt 366, 88 LE2d 203) (1985). Woldemichael must show that his counsel's performance was deficient, i.e., that no reasonable attorney would have done what the lawyer did, or failed to do what the lawyer did not. See Strickland, 466 U.S. at 687-689; State v. Worsley, 293 Ga. 315, 323 (2) (745 SE2d 617) (2013). He also must demonstrate prejudice, i.e., that "there is a reasonable probability that, but for counsel's errors, he would not have pleaded guilty and would have insisted on going to trial." Hill, 474 U.S. at 56-59. We adopt the habeas court's findings of fact unless they are clearly erroneous, but we apply the facts to the law de novo in determining whether trial counsel performed deficiently and whether any deficiency was prejudicial. Humphrey v. Morrow, 289 Ga. 864, 866 (717 SE2d 168) (2011).

Here, Woldemichael alleges that his trial counsel's performance was

11

deficient because counsel failed to advise Woldemichael that his custodial statements would be suppressed if he proceeded to trial. We agree that Woldemichael's custodial statements to law enforcement were inadmissible, but conclude that the habeas court's failure to analyze separately whether Woldemichael's recorded statements to his co-defendant were also inadmissible requires remand.

(a) *Woldemichael's statements to police*

When trial counsel's deficient performance is predicated on the inadmissibility of a defendant's statements, the defendant must make a strong showing that the damaging evidence would have been suppressed had counsel made the motion. Richardson v. State, 276 Ga. 548, 553 (3) (580 SE2d 224) (2003). In order for a confession to be admissible, it must be voluntary. See Brooks v. Florida, 389 U.S. 413, 415 (88 SCt 541, 19 LE2d 643) (1967); OCGA § 24-8-824; former OCGA § 24-3-50.[6] In determining whether a juvenile has given a statement voluntarily, a court considers nine factors set forth in Riley v.

_____

[6] The new Evidence Code carried forward former OCGA § 24-3-50, as the new OCGA § 24-8-824. The sole change in the statute is that the new provision replaces "must" with "shall" in the former phrase, "[t]o make a confession admissible, it must have been made voluntarily[.]"

12

State, 237 Ga. 124 (226 SE2d 922) (1976): (1) the age of the accused; (2) the education of the accused; (3) the knowledge of the accused as to the substance of the charge and nature of his rights to consult with an attorney; (4) whether the accused was held incommunicado or allowed to consult with relatives or an attorney; (5) whether the accused was interrogated before or after formal charges had been filed; (6) the methods used in interrogation; (7) the length of the interrogation; (8) whether the accused refused to give voluntary statements on prior occasions; (9) and whether the accused repudiated the extrajudicial statement at a later date. See Jackson v. State, 272 Ga. 191, 195 (3) (528 SE2d 232) (2000). The State would have borne the burden of demonstrating the voluntariness of Woldemichael's statements by a preponderance of the evidence had a motion to suppress been filed. See Lego v. Twomey, 404 U.S. 477, 489 (92 SCt 619, 30 LE2d 618) (1972).

The habeas court correctly determined that, considering the Riley factors, Woldemichael met his burden to show that prosecutors could not have met theirs.[7] At the time of the interview, Woldemichael was 14 years old and had

---

[7] Although Woldemichael made some statements to police before the totality of the circumstances surrounding the interview were such that his statements were no longer voluntary, none of those earlier statements was incriminating.

not yet entered high school, having failed the eighth grade. Law enforcement's interview of Woldemichael was a relatively lengthy two-and-a-half hours, and he was held in the interrogation room for more than four hours. As found by the trial court, there is no indication that the police contacted family when they picked him up or before they initiated questioning.[8] Although a parent's absence or presence is not dispositive of the question of whether a juvenile's confession is admissible, see Allen v. State, 283 Ga. 304, 306 (2) (a) (658 SE2d 580) (2008), it is a significant factor in the analysis. See Norris v. State, 282 Ga. 430, 431 (2) (651 SE2d 40) (2007).

Most significantly, the officers used aggressive interrogation methods, repeatedly suggesting to Woldemichael that cooperating with them in their investigation could inure to his benefit in the court proceedings to come. Former OCGA § 24-3-50, now the nearly-identical OCGA § 24-8-824, provided at the time of Woldemichael's guilty plea that "[t]o make a confession

---

[8] This finding is not clearly erroneous. Woldemichael testified that his mother was not present when he was taken away for questioning and that he had no contact with her during the interview, and the video of the interview indicates that police did not seek contact information for her until after the interrogation had ended. At that point, Woldemichael told police not to call his father, indicating the two did not communicate. Woldemichael's mother testified (through another witness who acted as an interpreter) at the plea hearing that Woldemichael's father "doesn't want anything to do with the kids or with me."

14

admissible, it must have been made voluntarily, without being induced by another by the slightest hope of benefit or remotest fear of injury." Here, officers told Woldemichael that if other suspects cooperated and he did not, that would make him look "[p]retty bad" before a judge. They suggested that his cooperation could affect whether he were charged as a juvenile or an adult. Woldemichael subsequently made inculpatory statements. As the interview continued, with officers pressing Woldemichael to give more details, Woldemichael asked whether his cooperation would really make a difference. In response, they insisted it would make "a big difference" from the perspective of prosecutor, jury, and judge. Then they specifically drew a connection between what he chose to say to them in the interview and what sort of sentence he would receive — "It starts at ten. It goes up from there. That's why I'm saying, when you walk out this door, you want this video to look as good as possible." And the officers made these statements to a 14-year-old middle schooler over the course of a two-and-a-half hour interrogation without attempting to contact his parents.

"It has . . . long been understood that 'slightest hope of benefit' refers to promises related to reduced criminal punishment — a shorter sentence, lesser

15

charges, or no charges at all." State v. Chulpayev, 296 Ga. 764, 771 (2) (770 SE2d 808) (2015) (citation and punctuation omitted); see also Canty v. State, 286 Ga. 608 (690 SE2d 609) (2010) (reversing convictions on basis that detective advised defendant that confessing to multiple crimes at once could result in a shorter term sentence); State v. Robinson, 326 Ga. App. 63, 64-66 (755 SE2d 869) (2014) (no error in trial court's exclusion of statements defendant made to police upon being told "'[t]he person that cooperates is the person that gets help'"). Some of the officers' statements to Woldemichael at least arguably constituted assurances creating a "hope of benefit" within the meaning of the statute. And offering a hope of benefit is a method of interrogation, a factor to be considered in evaluating the totality of the circumstances under Riley. Regardless of whether Woldemichael's statements to police would have been admissible under OCGA § 24-3-50 had he been an adult, under the standard applicable to juveniles, Woldemichael's inculpatory statements to police were involuntary under a totality of the circumstances.[9] Thus, the habeas court did not err in concluding those statements were subject to suppression.

_____

[9] The remaining Riley factors do not alter this conclusion.

16

(b)     *Woldemichael's statements to his co-defendant*

The habeas court's analysis also assumed that Woldemichael's conversation with Tolbert was inadmissible.[10] But the habeas court undertook no separate analysis as to the statements Woldemichael made to Tolbert. This requires a separate analysis. OCGA § 24-3-50 is not violated when no incentives or threats are involved in a defendant's decision to talk to a co-conspirator. See Thorpe v. State, 285 Ga. 604, 610-611 (6) (678 SE2d 913) (2009). And coercive police activity is a necessary predicate to a finding that a confession is involuntary within the meaning of the due process clause of the Fourteenth Amendment. See Colorado v. Connelly, 479 U.S. 157, 167 (107 SCt 515, 93 LE2d 473) (1986).

In response to our request for additional briefing on the admissibility of his statements to Tolbert, Woldemichael argues that he was coerced by police

---

[10] Regarding trial counsel's explanation that he did not seek suppression of Woldemichael's statements because he did not want the trial judge to see at least certain portions of the recording of Woldemichael's time in the interrogation room, the habeas judge wrote, "The statement should have been suppressed and no jury would have seen the statement or the laughter." This sentence, which is also found verbatim in one of Woldemichael's briefs before the habeas court, appears to be a reference to Woldemichael's repeated laughter during his conversation with his co-defendant, to which the prosecutor pointed during the plea hearing.

17

into his conversation with Tolbert. This requires an interpretation of detectives' statements to Woldemichael regarding his meeting with Tolbert, a fact-finding exercise for the habeas court. Woldemichael also argues that Tolbert "almost certainly would be considered" a state agent under the case law, an argument that raises additional factual questions about the circumstances under which Tolbert was placed in the interview room with Woldemichael. Given these particular factual questions, and because the voluntariness of a statement is a mixed question of fact and law, we remand to the habeas court to conduct the requisite analysis in the first instance. If the habeas court concludes that the statements to Tolbert were admissible, the court must then reconsider whether trial counsel was deficient and, if so, whether that deficiency prejudiced Woldemichael.

Judgment vacated and case remanded. All the Justices concur.

Decided May 30, 2017.

Habeas corpus. Ware Superior Court. Before Judge Blount, Senior Judge.

Christopher M. Carr, Attorney General, Patricia B. Attaway Burton,

18

Deputy Attorney General, Paula K. Smith, Senior Assistant Attorney General, for appellant.

Lynn M. Kleinrock, for appellee.