NOTICE: This opinion is subject to modification resulting from motions for reconsideration under Supreme Court Rule 27, the Court's reconsideration, and editorial revisions by the Reporter of Decisions. The version of the opinion published in the Advance Sheets for the Georgia Reports, designated as the "Final Copy," will replace any prior version on the Court's website and docket. A bound volume of the Georgia Reports will contain the final and official text of the opinion.

In the Supreme Court of Georgia

Decided: October 25, 2022

S22A0648. THE STATE v. POWELL.

COLVIN, Justice.

On February 28, 2019, police officers responded to a shooting where they discovered 15-year-old Paris Powell, Appellee, standing beside the decedent, Larry "Tre" Bryant. Appellee was interviewed by Detective John Gleason on March 1, March 4, and March 25, 2019, in connection with Bryant's death. Powell's mother, Tiffany (hereinafter "Ms. Powell"), was present at all relevant times. After a hearing, the trial court found that Appellee was not in custody for any of the interviews and determined that Appellee's March 1 and March 4 statements were freely and voluntarily given. However, the trial court partially suppressed Appellee's March 25 statement, finding that, under a totality of the circumstances, she did not knowingly and voluntarily make a statement as a matter of

constitutional due process. The State appeals the trial court's partial suppression of Appellee's March 25 statements, contending that the trial court clearly erred in determining that Appellee's statements were involuntary under *Riley v. State,* 237 Ga. 124 (226 SE2d 922) (1976). For the reasons explained below, we disagree with the State and affirm the ruling of the trial court.

1. *Procedural History*

The record shows that, during the investigation of Bryant's death, Appellee was interviewed by detectives on three separate occasions – March 1, March 4, and March 25, 2019. Eventually, Appellee was indicted for two counts of felony murder, one count of armed robbery, and one count of robbery in connection with Bryant's murder. Appellee filed a pretrial "Motion to Suppress Custodial Statement," seeking to suppress all three of her March 2019 interviews and her subsequent written statements. Appellee alleged that all of her statements were induced by an improper hope of benefit in violation of OCGA § 24-8-824. She further alleged that the statements were made while she was in custody, triggering the

2

requirement that she be read her rights pursuant to *Miranda v. Arizona*, 384 U.S. 436 (86 SCt 1602, 16 LE2d 694) (1966), and that Detective Gleason's failure to read Appellee her rights rendered all subsequent statements involuntary. At the *Jackson-Denno*[1] hearing, defense counsel further clarified that the motion also included a claim that Appellee's "statements were [not] free and voluntary" as a matter of constitutional due process. The prosecutor and the court then agreed that the court needed to consider the totality of the circumstances to determine whether Appellee's statements were made freely and voluntarily.

2.    *Evidence Presented at the Jackson-Denno Hearing*

At the pretrial hearing, the State called Detective Gleason as a witness and introduced into evidence the video recordings of Appellee's three interviews and her three written statements. Detective Gleason testified that Appellee was not in custody for any of her interviews and was free to leave, that she was not read her *Miranda* rights at any time, and that she was never informed that

---

[1] *Jackson v. Denno*, 378 U.S. 368 (84 SCt 1774, 12 LE2d 908) (1964).

3

her interviews were being recorded.

(a)   First Interview – March 1, 2019

Detective Gleason testified that, on March 1, 2019, Appellee arrived at the Henry County Police Department with her mother to speak with him about Bryant's death.  At that time, detectives believed that Appellee was simply an eyewitness to the shooting.  The video recording of the interview is 1 hour and 48 minutes long.  The first 25 minutes of the video recording show Appellee sitting alone in the interview room crying.  Detective Gleason and Ms. Powell can be heard speaking just outside of the room.  At the motion hearing, Detective Gleason confirmed that, during this conversation, "[Ms.] Powell told [him] that she didn't want to have [Appellee] talk to anybody without a lawyer."  Detective Gleason explained to Ms. Powell that Appellee "was [my] only witness.  The only person that saw this murder, I wish you'd let me talk to her.  I don't have any way to get a lawyer up here and it's not like we have one sitting in the lobby.  She is my witness."  After this exchange, Ms. Powell agreed to let the detective speak with her daughter.

4

Detective Gleason testified that he never asked Appellee if she wanted to speak with him. Further, when defense counsel inquired into this issue on cross-examination, the following exchange occurred:

Counsel: Mr. Gleason, during these interviews you always spoke to [Ms.] Powell first; is that right?

Det. Gleason: Yes, ma'am. I believe so.

Counsel: Okay. Did you ever ask [Appellee] if she wanted to talk to you?

Det. Gleason: No, because I spoke to [Ms. Powell].

Counsel: You always spoke to [Ms. Powell]; is that correct?

Det. Gleason: That's correct.

The video shows that, shortly after Detective Gleason and Ms. Powell enter the interview room, the detective tells Appellee, "You're not in trouble. You're a witness. You're the most important witness I've got right now." At the suppression hearing, Detective Gleason testified that he did not explain to either Appellee or her mother that Appellee "could get in trouble" or that "they could have a lawyer" present during the interview.

For the next 71 minutes of the recorded interview, both

5

Detective Gleason and Ms. Powell questioned Appellee regarding what she had seen. Detective Gleason testified that Ms. Powell "was helping with the interview." During this time, Appellee described Bryant's death as a drive-by shooting. Then, in the last 12 minutes of the video, Detective Gleason and Ms. Powell left Appellee alone in the interview room and engaged in another discussion, the contents of which are not in the record. At the end of the interview, Appellee gave a written statement consistent with her description of events. She then left the police station with her mother.

(b)    Second Interview – March 4, 2019

On March 4, 2019, Appellee and her mother returned to the police station for a second interview with Detective Gleason after Ms. Powell reported to the detective that Appellee had additional information about the shooting. This interview lasted approximately 1 hour and 35 minutes. At the outset, Detective Gleason stated,

> I felt like at the time [we last spoke] there might be more
> that you had to tell me, and I'm not upset with you. I need
> you to understand that, okay? This is basically just to get

6

to the whole story, okay? So what new information do you have to tell us?

Appellee admitted that she knew that the passenger in the car was a man named "Chris," that Bryant was selling drugs to the men in the car, and that Bryant had tried to rob the men in the car during the drug deal. Appellee apologized for not providing that information during her first interview, to which Detective Gleason responded,

Listen, this is not the first time that people hold back information, ya know? Um, I'm a little bit disappointed just to be finding out now, but it's better now than not at all, ya know? So I'm not mad at you, I knew you had a little bit more to tell me.

Detective Gleason then confronted Appellee with information he had obtained suggesting that Appellee had "set up" Bryant for the robbery. Both Appellee and her mother adamantly denied this allegation. The video shows that, during the remainder of the interview, Appellee provided additional details about events leading up to Bryant's death, while downplaying her own role in the shooting. She also provided a written statement detailing this new

7

information. After the interview, Appellee went home with her mother.

(c)     Third Interview – March 25, 2019

On March 25, at the request of Detective Gleason, Appellee and her mother returned to the police station for a third interview. Detective Gleason testified that he asked Appellee and her mother to come back because he had discovered that Appellee "had prior knowledge of what was going on and that she had left out more details." Detective Gleason confirmed at the suppression hearing that he "knew that during this third interview [he was] going to ask [Appellee] questions that could possibly incriminate her in a crime." But he testified that he did not advise Appellee of her *Miranda* rights because she was not in custody and because he did not consider the interview to be an interrogation.

The video recording shows that, at the beginning of the third interview, the following exchange occurred:

Ms. Powell:      Look, can I say this before we get started with the questions?
Det. Gleason:   Um, hmm.

8

| | |
|---|---|
| Ms. Powell: | At the point where we might need a lawyer, you're going to do the right thing and say we might need a lawyer? You're not just going to have me come down here and bring her and deliver her up to you if and when something happens? |
| Det. Gleason: | When I told you we hadn't taken any warrants, I was serious. |
| Ms. Powell: | I know that, that's why I believe you and that's why I have been very – but I don't want y'all kicking my door in at 3:00 in the morning or come for her and if anything happens – just verbalize with me so I . . . |
| Det. Gleason: | I will. I'll let you know. I'll let you know. |
| Ms. Powell: | I'm scared to death about what's about to happen. |

Thereafter, Detective Gleason confronted Appellee regarding her prior dishonesty. Approximately six minutes into the interview, Detective Gleason told Appellee, "I understand why you lied," to which Ms. Powell responded, "I don't." Detective Gleason explained that he knew Bryant was buying drugs from the men in the car, not selling them. Appellee denied this, and Ms. Powell said, "[T]his just gets worse and worse," before turning away from her daughter. While Detective Gleason continued to talk, Appellee looked over to her emotional mother a couple times, but Ms. Powell remained

9

turned away.

At approximately seven minutes into the video, the detective told Appellee that he had information that she called "Chris" to set up the drug sale. At this point, Ms. Powell dropped her head into her arms. Appellee admitted that Bryant asked her to help him commit a robbery and that she "gave him Chris." Appellee continued to answer Detective Gleason's questions, and then, at 9 minutes and 30 seconds into the interview, the following exchange occurred:

Det. Gleason: [Ms. Powell] you asked me earlier why she wasn't going to tell me – why she kept lying about this?

Ms. Powell: Yeah, I see it. I see now.

Det. Gleason: Right, but here's the other – there's two reasons. One reason she lied is, if she admits that they were there buying marijuana, she's worried about her probation. But being part of setting up a robbery, where [Bryant] ends up dead, it's a whole different situation because now [Bryant's] blood is on [Appellee's] hands.

Ms. Powell: Oh my god. Do we need a lawyer? Do I need a lawyer?

Det. Gleason: That's entirely up to you [Ms. Powell][2] – but it's so important that we get

---

[2] At this point in the video, Detective Gleason is facing Ms. Powell when he makes his initial statement. He then pauses and turns to face Appellee, addressing the remainder of the colloquy to her.

consistent truth here because, no matter what you think of [Bryant's mom] right now, and no matter what you think of [Bryant's] lifestyle, the young man is dead. And he didn't have to be. It's not your fault that he's dead, let's get that straight, it's not your fault. But had [Appellee] said "no" [to setting up the robbery], it might have changed everything. You understand?

The detective testified that, by saying it was "entirely up to you" in response to Ms. Powell's question about whether they needed a lawyer, he meant to convey to Ms. Powell that "you're her mother, what do you want to do[?]"

Ms. Powell then asked Detective Gleason questions about the evidence he had concerning the crime, including who shot first and if all of the people involved were "underage." Detective Gleason told Ms. Powell that the other men involved were "not juveniles." When she asked if Appellee "was considered a juvenile on this," Detective Gleason responded, "[Y]es."

Thereafter, the detective asked Appellee more questions about her role in setting up the robbery, and she made many incriminating

11

statements throughout the remaining 30 minutes of the interview. Appellee once again memorialized her statement in writing. Detective Gleason testified that, after this third interview, Appellee became a suspect. However, she was not taken into custody at that time, and she was allowed to go home with her mother.

3. *Trial Court Order*

After the hearing, the trial court issued a written order denying Appellee's motion in part, finding that "the State has provided a prima facie showing that the first interview, second interview, and beginning of the third interview were freely and voluntarily given by Defendant without hope of benefit or fear of injury [under OCGA § 24-8-824]." Regarding the rest of Appellee's statements, from 9 minutes and 30 seconds into the video recording onward, the trial court observed that "[a] critical factor in this case is whether [Appellee] understood her constitutional right to consult with an attorney." Guided by this Court's decision in *Riley*, the trial court concluded that, at the time of her March 25 interview: (1) Appellee

12

was 15 years old; (2) Appellee understood English[3]; (3) Appellee was not advised of her *Miranda* rights because she was not in custody at the time of the interview, although Detective Gleason knew he would be asking Appellee questions "which could possibly incriminate [her]"; (4) Appellee knew police wanted to speak with her about the shooting and, although she was told that she was only a witness and police had not obtained any warrants, she was never informed that she "could go to jail or lose her freedom or that the statements could be used against her at trial," nor was she told "it was optional . . . to speak with [Detective Gleason]"; (5) although Appellee had a parent present for the duration of the interview, that parent previously initiated one interview and "even participated in questioning her daughter" in another; (6) Appellee was "incorrect[ly] and erroneously advised . . . that her mother was the only person who could exercise her constitutional right to counsel"; (7) Appellee

---

[3] At the *Jackson-Denno* hearing, the State asked Detective Gleason whether he knew if Appellee was enrolled in school at the time of the interview. The detective testified that Appellee "mentioned school," but there is no evidence establishing Appellee's grade level when she spoke to the detective.

was allowed to leave and go home after the interview; (8) Appellee's two prior statements were made voluntarily; and (9) while Ms. Powell "specifically asked [Detective] Gleason to instruct her when/if [Appellee] needed legal counsel, and to verbalize if a warrant was going to be issued," she "did not unequivocally request a lawyer." The trial court then determined that, under the totality of the circumstances, the State had failed to show that, after the first 9 minutes and 30 seconds of the March 25 interview, "Appellee knowingly, intelligently, freely and voluntarily continued to speak with the police and provide[] the written statement."

The parties do not challenge the trial court's conclusions that Appellee's noncustodial March 1 and March 4 verbal and written statements were made freely and voluntarily, that Appellee was not in custody during those interviews for the purposes of *Miranda*,[4] and that those statements were not induced by a hope of benefit or fear

---

[4] Although Appellee noted in a footnote of her brief that her custodial status during the interviews was disputed in the trial court, Appellee did not cross-appeal the trial court's determinations that she was not in custody for the purposes of *Miranda*.

of injury pursuant to OCGA § 24-8-824. Accordingly, our review is limited to the trial court's partial suppression of Appellee's March 25 verbal statement and the complete suppression of her subsequent written statement.

4. *Analysis*

As an initial matter, the State contends that the trial court "mistakenly combine[d] the law regarding in-custody and out-of-custody statements of juveniles," arguing that *Riley* applies only to custodial interviews. However, in addition to applying *Riley* in order to determine whether a juvenile voluntarily waived his or her *Miranda* rights during a custodial interview, "this Court has also relied on its factors in evaluating more general due-process voluntariness cases for juveniles." *Lester v. State*, 310 Ga. 81, 85 n.7 (849 SE2d 425) (2020) (citing *Oubre v. Woldemichael*, 301 Ga. 299, 305 (800 SE2d 518) (2017)). See also *Daniels v. State*, 313 Ga. 400, 406 n.9 (870 SE2d 409) (2022); *Murray v. State*, 276 Ga. 396, 397-398 (2) (578 SE2d 853) (2003); *Jackson v. State*, 272 Ga. 191, 195 (3) (528 SE2d 232) (2000).

15

Turning to the trial court's order concerning Appellee's March 25 verbal and written statements, in analyzing the totality of the circumstances, the trial court considered the many factors set forth in *Riley*,[5] which includes:

> (1) age of the accused; (2) education of the accused; (3) knowledge of the accused as to both the substance of the charge and the nature of [her] rights to consult with an attorney and remain silent; (4) whether the accused is held incommunicado or allowed to consult with relatives, friends or an attorney; (5) whether the accused was interrogated before or after formal charges had been filed; (6) methods used in interrogation; (7) length of interrogations; (8) whether vel non the accused refused to voluntarily give statements on prior occasions; and (9) whether the accused has repudiated an extra judicial statement at a later date.

*Riley*, 237 Ga. at 128 (citation and punctuation omitted). "In reviewing a ruling on the admissibility of a defendant's statements where the facts are disputed, we accept the trial court's factual

---

[5] A number of us have recently expressed concerns about the prescriptive and restrictive nature of *Riley*'s nine-factor analysis for juveniles. See *Daniels*, 313 Ga. at 418 (Nahmias, C.J., concurring specially in part); *State v. Burton*, No. S22A0684 (Ga. Sept. 20, 2022) (Pinson, J., concurring) ("*Riley* appears to be out of step with U.S. Supreme Court precedent"). Nonetheless, *Riley* remains controlling authority on this issue, and no party in this case has asked us to reconsider it.

findings and credibility determinations unless they are clearly erroneous, but we independently apply the law to the facts." *State v. Abbott*, 303 Ga. 297, 299 (812 SE2d 225) (2018) (citation and punctuation omitted). See *Hughes v. State*, 296 Ga. 744, 746 (1) (770 SE2d 636) (2015) ("When the facts material to a motion to suppress are disputed, it generally is for the trial judge to resolve those disputes and determine the material facts."). This Court affords "less deference to the trial court . . . to the extent that material facts definitively can be ascertained exclusively by reference to evidence that is uncontradicted and presents no questions of credibility." *Hughes*, 296 Ga. at 746 n.5.

The State argues that the trial court made a clearly erroneous factual finding when it determined that Detective Gleason improperly advised Appellee "that her mother was the only person who could exercise her constitutional right to counsel." In considering a trial court's suppression ruling, "'an appellate court must construe the evidentiary record in the light most favorable to the factual findings and judgment of the trial court.'" *Walker v.*

17

*State*, 312 Ga. 332, 336 (862 SE2d 542) (2021) (quoting *State v. Clark*, 301 Ga. 7, 8 (799 SE2d 192) (2017)). Viewing the evidence in this light, and giving the trial court's factual findings and credibility determinations the proper deference, the State's claim fails. The record shows that Detective Gleason did not ask Appellee directly whether she wanted to talk to him or whether she wanted to do so without a lawyer, but rather directed all discussions of Appellee's constitutional rights to her mother. He further testified that, when Ms. Powell asked if "we" needed a lawyer, his reply of "[t]hat's up to you" was meant to convey, "you're her mother, what do you want to do[?]" Under these circumstances, we cannot say that the trial court clearly erred by implicitly crediting Detective Gleason's testimony and finding that he incorrectly advised Appellee that only her mother could invoke Appellee's right to counsel.

The State also argues that the trial court erred because it found that all of the *Riley* factors were "satisfied" except for one. We disagree with the State's characterization of the trial court's order as finding that all of the *Riley* factors favored admission. Moreover,

we cannot say that the trial court clearly erred with regard to any of its factual findings, as each of them find support in the record. Finally, we cannot say that the trial court erred in suppressing Appellee's March 25 verbal statement in part and written statement from that day in full.

Reviewing the nine *Riley* factors in order, first, the record supports the trial court's finding that Appellee was 15 year old when she was interviewed by Detective Gleason. Second, the record is silent as to Appellee's education level; however, the trial court found, and the record shows, that Appellee "understood English." As to the third factor, the trial court found, and the record shows, that Appellee knew she was being interviewed about the shooting that led to Bryant's death. However, the record also supports the trial court's findings that: Appellee was consistently told that she was merely a witness; no warrants had been issued in the case; Appellee was never informed that her statements could be used against her at trial or that she could "go to jail or lose her freedom" based upon what she told detectives; and that, while Detective Gleason

19

consulted with Ms. Powell prior to each interview, he "[did not] state it was optional for [Appellee] to speak with him." Further, as discussed above, the record supports the trial court's finding that Detective Gleason "incorrect[ly] and erroneously advised [Appellee] . . . that her mother was the only person who could exercise [Appellee's] constitutional right to counsel during the third interview."

Regarding the fourth factor, the record supports the trial court's finding that Appellee's mother was present, and Appellee was allowed to consult with her during the interviews. However, the record also supports the trial court's findings that Ms. Powell actively participated in the questioning of her daughter and brought her daughter to the police station on a prior occasion in order to offer more information to detectives. Further, the video recording shows that Ms. Powell was extremely emotional throughout her daughter's interviews and, at one point, became so upset that she physically turned away from Appellee while Appellee was implicating herself in a crime.

The trial court made no findings as to the fifth factor; however, it is undisputed that Appellee was interviewed prior to the filing of any formal charges. As to the sixth factor, the record supports the trial court's findings that Appellee was given no hope of benefit in exchange for her statements, that she was provided water prior to all interviews, and that she was free to leave after her interviews. However, the record also supports the trial court's findings that Detective Gleason knew, prior to the third interview, that Appellee had not been truthful with him, and that he was going to ask the 15-year-old Appellee questions that, if she answered, could possibly be incriminating.

Though the trial court made no findings with respect to the seventh factor, it is undisputed that all of Appellee's interviews were less than two hours long, with the March 25 interview being the shortest in duration. As to the eighth factor, the record supports the trial court's findings that Appellee's two prior statements were voluntarily given. Finally, the trial court made no findings regarding the ninth factor; however, due to the pre-trial status of

21

this case, there is nothing in the record currently before us to suggest that Appellee has repudiated these statements.

While it is true that the trial court made some findings that might have weighed in favor of admitting Appellee's statements at trial, we cannot say that the trial court erred in concluding that, under *Riley*, the inculpatory verbal and written statements Appellee made to detectives following the first 9 minutes and 30 seconds of the recorded interview on March 25 were involuntary. See *State v. Rodriguez*, 274 Ga. 728, 728-729 (559 SE2d 435) (2002) (holding that a juvenile, who was incorrectly advised by police that his mother was the only person who could exercise his constitutional rights, did not knowingly, intelligently, and voluntarily waive his rights to remain silent and to counsel). Compare *Norris v. State*, 282 Ga. 430, 431-432 (2) (651 SE2d 40) (2007) (holding that the juvenile defendant was properly advised of his right to counsel when, among other things, the detective conducting the interview informed both the defendant and his mother that "the decision of whether to speak to an attorney belonged to both [the mother] and Appellant").

22

Accordingly, we affirm the trial court's suppression of those statements.

*Judgment affirmed. All the Justices concur, except LaGrua, J., who dissents.*

LAGRUA, Justice, dissenting.

Because the trial court applied the wrong standard of law in granting Appellee's motion to suppress, and because I believe that, by affirming the trial court's ruling, the majority opinion will only perpetuate the confusion surrounding the factors a trial court should consider in determining the admissibility of a juvenile defendant's statement at trial, I respectfully dissent.[6]

As noted in the majority opinion, Appellee was interviewed by Detective Gleason on three different dates in March 2019. Appellee was arrested several days *after* the third and final interview. In her motion to suppress, Appellee sought to suppress all of the statements she made during these interviews, contending that she

---

[6] Additionally, in deferring to the factual findings of the trial court, the majority opinion has recounted evidence that is irrelevant to and beyond the scope of the evidence the trial court cited and relied upon in reaching its conclusion that a portion of Appellee's third interview and third written statement were involuntary—i.e., the majority opinion goes into considerable detail about conversations between Ms. Powell and Detective Gleason during Appellee's first and second interviews and the beginning of the third interview, but the trial court concluded that those statements were voluntary. As such, evidence of what transpired during those interviews is irrelevant to the voluntariness and admissibility of the last 30 minutes of Appellee's third interview and her corresponding written statement.

was in "police custody" when she was interviewed and that law enforcement "failed to notify [her] of the right to remain silent, the right to counsel, the right to appointment of counsel, the right to have counsel present during questioning, [and] the fact that anything that she mentioned during questioning could be used against her in [c]ourt" and failed "to get a free and voluntary waiver of those rights before questioning her."

Following the hearing on Appellee's motion to suppress, the trial court issued a written order concluding, among other things, that during and after each interview, Appellee was "not in custody" and "was allowed to leave and go home," and that Detective Gleason testified that "no threats, promises or hope of benefit" were made to induce Appellee's statements during the interviews. Nevertheless, the trial court concluded that Detective Gleason's response to Ms. Powell's questions—"Do we need a lawyer? Do I need a lawyer?"— rendered the remainder of Appellee's third interview involuntary,[7]

---

[7] The majority opinion states that the trial court "partially suppressed Appellee's March 25 statement" because the trial court found that, "under a totality of the circumstances, [Appellee] did not knowingly and voluntarily

and thus, the trial court granted the motion with respect to the rest of Appellee's third interview and her corresponding written statement.

"In reviewing the trial court's grant or denial of a motion to suppress, we apply the well-established principles that the trial court's findings as to disputed facts will be upheld unless clearly erroneous and the trial court's application of the law to undisputed facts is subject to de novo review[.]" *Moon v. State*, 312 Ga. 31, 57 (4) (860 SE2d 519) (2021) (citation and punctuation omitted). The trial court's order reflects that the trial court misapplied the law to be considered in evaluating the voluntariness of a juvenile defendant's statement given in a non-custodial interview.

The trial court evaluated the admissibility and voluntariness of Appellee's statements through the lens of a *custodial* interrogation and applied the *Riley* factors. "By custodial

_____

make a statement *as a matter of constitutional due process*." (Emphasis supplied). Notably, this "constitutional due process" language is not present in the trial court's written order nor was such language ever used or referenced by counsel or the trial court during the hearing on Appellee's motion to suppress.

interrogation, we mean questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." *Oregon v. Mathiason*, 429 U.S. 492, 493 (1) (97 SCt 711, 50 LE2d 714) (1977) (explaining that the United States Supreme Court's "decision in *Miranda* set forth rules of police procedure applicable to "custodial interrogation"). And *Riley* "was initially decided in the context of whether a juvenile defendant had knowingly and intelligently waived his rights under *Miranda*." *Lester v. State*, 310 Ga. 81, 85 (2) n.7 (849 SE2d 425) (2020). "[T]he issue [in *Riley*] was whether there was a knowing and intelligent waiver of constitutional rights [as defined by *Miranda* and its progeny] by a defendant." *Byrum v. State*, 282 Ga. 608, 611 (5) n.2 (852 SE2d 557) (2007).

While this Court "has also relied on [the *Riley*] factors in evaluating more general due-process voluntariness cases for juveniles," *Lester*, 310 Ga. at 85 (2) n.7, I think this reliance has led to confusion for trial courts in determining what standard and factors apply in evaluating the voluntariness of a juvenile's

27

statement in a *non*-custodial setting.  See *Oubre*, 301 Ga. at 305 (2)

(a) (holding that "[i]n determining whether a juvenile has given a

statement voluntarily, a court considers nine factors set forth in

*Riley*"). Certainly, a statement can never be coerced, as it would

violate an individual's due process rights, but our prior applications

of *Riley* appear to have caused the trial court in this case to conflate

the *Riley* test "with a more general totality-of-the-circumstances due

process analysis." *Lester*, 310 Ga. at 85 (2) n.7.

As set forth in the trial court's order, the trial court applied the

following legal analysis in evaluating the voluntariness of Appellee's

statements:

> The question of a **voluntary, knowing and intelligent
> waiver of [a defendant's] right to counsel** depends on
> the totality of the circumstances, and the State has a
> heavy burden in showing that **the juvenile did
> understand and waived her rights**. . . . In determining
> whether a juvenile's **custodial** statement was voluntarily
> and knowingly given," the trial court must consider the
> factors set forth in *Riley*, 237 Ga. at 128. . . . Parental
> presence or ability to consult with a family member alone
> does not conclusively establish **waiver of a juvenile's
> constitutional right to counsel**. . . . Only the
> individual, juvenile or adult, can **exercise their
> constitutional right**.

(Emphasis supplied).  The trial court, citing *Rodriguez*, 274 Ga. at 729, determined that "**[a] critical factor in this case is whether [Appellee] understood her constitutional right to consult with an attorney**," ultimately holding that Detective Gleason's response to Ms. Powell's question about whether she needed a lawyer "erroneously advised" Appellee that "**her mother was the only person who could exercise her constitutional right to counsel** during the third interview[.]" (Emphasis supplied).

The language of the trial court's order recited above demonstrates that, even though the trial court determined that Appellee was not in custody and was free to leave, the court still analyzed Appellee's statements as though she was in custody.  However, in accordance with the finding that Appellee was not in custody, law enforcement had no obligation to inform Appellee of her constitutional rights under *Miranda*, and Appellee did not have a Sixth Amendment right to be appointed counsel.  See *Petty v. State*, 283 Ga. 268, 270 (2) (658 SE2d 599) (2008) (holding that the Fifth

29

Amendment right to counsel under *Edwards v. Arizona,* 451 U.S. 477 (101 SCt 1880, 68 LE2d 378) (1981), which requires "that all questioning cease after an accused has requested counsel, applies only to custodial interrogation"). Because Appellee's "voluntary inculpatory statements" were made "prior to the point at which *Miranda* warnings were constitutionally required," the "question of whether [s]he knowingly and intelligently waived h[er] rights [was] not implicated." *Byrum*, 282 Ga. at 611 (5) n.2.

To determine the admissibility of Appellee's non-custodial statement, the trial court should have evaluated the voluntariness of that statement under a more general totality-of-the-circumstances due process analysis[8] by inquiring "into all the circumstances surrounding the interrogation," including "the juvenile's age, experience, education, background, and intelligence." *Fare v. Michael C.*, 442 U.S. 707, 725 (III) (99 SCt 2560, 61 LE2d

---

[8] Although the majority opinion suggests, as noted above, that the trial court applied such an analysis, that conclusion is not supported by the trial court's written order or the transcript of the motion-to-suppress hearing.

197) (1979).[9]  The trial court should have also determined whether, pursuant to OCGA § 24-8-824, the statement was "made voluntarily, without being induced by another by the slightest hope of benefit or remotest fear of injury."  See *Oubre*, 301 Ga. at 306 (2) (a) (holding that "offering a hope of benefit is a method of interrogation, a factor to be considered in evaluating the totality of the circumstances").

Here, the trial court found that the first interview, second interview, and beginning of the third interview were "freely and voluntarily given by [Appellee] without hope of benefit or injury." However, the trial court's written order is silent as to whether Appellee was coerced by any promises, threats, or hope of benefit during the remainder of the third interview, and accordingly, there

---

[9] Even if Appellee had been in custody at the time of the interview, the totality-of-the-circumstances approach established in *Fare* would still be the appropriate test to determine whether Appellee's statements were voluntary and whether she waived her constitutional rights under *Miranda*.  See *State v. Burton*, __ Ga. __ (2022 WL 4349304) (Case No. S22A0684, decided Sept. 20, 2022) (Pinson, J., concurring) (noting that in *Fare*, the United States Supreme Court held that "the test for whether a person has waived his rights under *Miranda []* is the same for juveniles as it is for adults, and it requires a 'totality-of-the-circumstances approach'").

31

was no finding as to whether Appellee's statement was rendered involuntary on that basis. See OCGA § 24-8-824.

Given the trial court's misapplication of the law to its factual findings and the lack of any explanation to illustrate why the trial court decided that Detective Gleason's response to Ms. Powell rendered the remainder of Appellee's third interview involuntary—despite findings weighing in favor of the *opposite* conclusion—I cannot affirm the trial court's suppression of those statements. And it is my position that, rather than affirming the trial court's misapplication of the law, we should clarify the standard for trial courts to apply when evaluating a juvenile's statement to law enforcement in a non-custodial setting and reverse and remand this case to the trial court for the application of that standard.